Filed 8/11/16  In re Y.D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re Y.D., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D069919 |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1157) |
| v. | |
| V.D. et al., | |
| Defendants and Appellants. | |


APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant J.J.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant V.D.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

J.J. (Father) and V.D. (Mother) appeal from a juvenile court order terminating their parental rights to their daughter (Y). (Welf. & Inst. Code, § 366.26.)[1] Father challenges the court's finding he did not have a sufficient relationship with Y to preclude the termination of his parental rights. (§ 366.26, subd. (c)(1)(B)(i).) Mother contends that if we reverse the termination order as to Father, we must also reverse the order as to her.

We affirm. Substantial evidence supports the court's finding Father did not have a beneficial parent-child relationship with Y and therefore the court did not abuse its discretion in finding the statutory exception inapplicable. (§ 366.26, subd. (c)(1)(B)(i).)

FACTUAL AND PROCEDURAL SUMMARY

*Background Summary*

Because Father's sole appellate contention concerns the beneficial parent-child exception to termination of parental rights, we only briefly summarize the events leading to the section 366.26 reference. As Mother does not challenge the termination order as to her, we discuss facts pertaining to Mother only as they relate to Father's case.

Y was born in January 2014. Two weeks later, the San Diego Health and Human Services Agency (Agency) filed a juvenile dependency petition, alleging the parents

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

(Mother and Father) were unable to care for Y. (§ 300, subd. (b).) The petition alleged Y tested positive for methamphetamine at birth; Mother admitted using methamphetamine during pregnancy; Mother had used methamphetamine for the past seven years; Father was unable to stop Mother's drug use during the pregnancy; and Father physically abused Mother while she was pregnant with Y.

Shortly after, the court removed Y from Mother's custody and placed Y with her maternal aunt. Two of Y's older siblings live in the same household.

In May 2014, the juvenile court made a true finding on the petition, and determined placement with either parent would be detrimental to Y. In reaching these conclusions, the court reviewed police records showing Father hit Mother in the face (leaving a bruise) while Mother was seven months pregnant with Y. Although Father had not been arrested, the evidence showed Father (a trained boxer) had anger management problems and had been previously violent toward Mother. Because she feared Father would be deported, Mother had not reported the assaults. The evidence also showed Mother had been arrested for committing domestic violence against Father.

During the next several weeks, Father had weekly visits with Y. In June 2014, Father moved to Tijuana, and thereafter had supervised visits twice per month at the Mexican consulate.

In its six-month report, the Agency recommended terminating reunification services for both parents. Several months later, in February 2015, the Agency changed its recommendation, and requested more services be provided for Father. In response, the court ordered continued supervised visitations at the Mexican consulate and ordered

3

Father to engage in a domestic violence program to address the issues that led to his violent confrontations with Mother.

For the next several months, Father continued to have twice-monthly visits with Y at the Mexican consulate. At these visits, Father was affectionate and attentive to Y's needs.

In August 2015, the Agency recommended that reunification services be terminated and the matter be referred to a section 366.26 hearing. Father opposed the recommendation, and requested that Y be placed in his care or that he be provided expanded visitations to include unsupervised visits or visits supervised by a relative.

In September 2015, the court held a combined 12-month and 18-month hearing on these requests. After a hearing, the court found reunification services had been reasonable, but Father had failed to address the problems leading to the jurisdictional findings. The court noted the case had been before it "for a very long time," and the court was "well aware of the history of [the] case" and was "very familiar" with the background facts and the current issues. After considering all the evidence, the court found Father had not made meaningful progress on his domestic violence issues, including that he continued to be unwilling to accept responsibility for his violent conduct. The court terminated reunification services and referred the matter to a selection and implementation hearing. (§ 366.26.)

*Agency's Section 366.26 Reports*

In December 2015, an Agency social worker prepared an assessment report for the section 366.26 hearing. The social worker stated that (almost) two-year-old Y has been

4

living with her maternal aunt since she was an infant and is "securely attached" to her aunt and was thriving in her care. The social worker also observed several visits between Father and Y at the Mexican consulate, and detailed her observations in the report.

In summary, the social worker said the visits between Father and Y were always pleasant and happy, but Y did not manifest any emotional connection to him and Y "does not seem completely comfortable around [Father]." The social worker explained: "[Y] does not seek out [Father] for affection, or to meet any of her emotional or primary needs, she also is not distressed when separated from [Father] and uses a lot of social referencing when engaging with [Father]." The social worker also discussed Mother's allegations that Father has continued to commit domestic violence, and Father's continued unwillingness to take responsibility for the domestic violence incidents.

Based on her observations, review of the file, and conversations with the parents and the current caretaker, the social worker opined there was no beneficial parent-child relationship between Father and Y that would result in Y suffering harm if the relationship was terminated. The social worker also found it was "highly likely" Y would be adopted if the court selected adoption as the permanent plan. The social worker stated the maternal aunt is eager to adopt Y, and that if that adoption is unsuccessful, Y is generally adoptable "based on her numerous appealing characteristics, including [her] young age, gender, and easy going personality."

Two months later, the social worker prepared an addendum report, stating Mother had continued to accuse Father of physically and emotionally abusing her, and Father admitted that Mother had come to his house. The addendum also described recent visits

5

between Father and Y: "[Y] often uses social referencing with the social worker any time that [Father] gets too close to her (i.e. hugs, kisses, picking her up, sitting close to her), this indicates that [Y] does not feel completely comfortable or trust [Father]. As the visits have progressed [Y] has become more familiar with the routine at the consulate, and began to engage more easily with [Father]. [Father] . . . seems to have a difficult time engaging with [Y], many of the visits he engages in parallel play with [Y] and remains silent for much of the visits. [Y] will often walk to the social worker to request help or engage with the social worker instead of [Father]. . . . Additionally, at the end of each visit, when [Father] says good bye to [Y], [Y] often is not interested in saying good bye and is distracted with something else, or simply waves goodbye, but she does not cry or appear to be sad when separated from her father."

*Section 366.26 Hearing*

At the February 2016 section 366.26 hearing, both Father and Mother were represented by counsel. At the outset of the hearing, the Agency's counsel requested the court receive and consider the social worker's assessment report and the addendum reports, and all parties stipulated to the court doing so. Counsel waived the right to cross-examine the social worker.

The Agency's counsel then argued that clear and convincing evidence showed it is likely Y will be adopted if parental rights are terminated and that none of the section 366.26, subdivision (c)(1)(B) exceptions apply. With respect to the beneficial parent-child exception, the Agency's counsel stated that Mother had not maintained contact with Y and although Father participated in the visits at the Mexican consulate, the interactions

6

were "simply a one hour or less visitation, where the child was present, the father was present. [There were] no interactions that would allow [the] court to find . . . a parent-child relationship exists."

Father's counsel disagreed, and urged the court to find the beneficial parent-child relationship exception precluded adoption. Counsel emphasized the regularity of Father's visits and the facts showing "the child [does] not show[ ] distress" during the visits. Father's counsel argued, "[Y] allow[s] the father to show affection to her without . . . pulling away; maybe not reciprocating, but not pulling away."

At the conclusion of the hearing, the court stated the evidence supported the Agency's recommendations. The court found by clear and convincing evidence that Y was adoptable. With respect to the beneficial parent-child relationship exception, the court found that Father "has maintained regular visitation and contact with the child within the parameters that were afforded to him," but he has not "established the second prong . . . that is that the benefit [to] Y of maintaining the parent-child relationship outweighs the benefits of adoption."

The court reasoned there was no evidence that severing Y's relationship with Father "would deprive her of a substantial, positive emotional attachment such that she would be greatly harmed." The court recognized that Father's visits with Y were "positive" and that Y was "accepting of affection," and that Father "was, on many visits, a good and affectionate playmate with her . . . ." But the court said Y "does not look to him . . . to be [in] a parental role, . . . or to meet her needs," and Y separates easily from

7

Father. The court noted that Y's "connection to her father [has] sort of ebbed and flowed."

The court also discussed that two-year-old Y has strong needs for stability and permanence, and that Y is "at a very fundamental stage, where security and stability and consistency are very, very important to her development." The court said that "based on [Y's] age and her particular needs," selecting a lesser plan "would be [a] tragic" outcome for Y.

Based on its consideration of all the evidence and its familiarity with the case since its inception, the court found the beneficial parent-child exception inapplicable and that Y was adoptable. The court thus terminated the parental rights of both Mother and Father.

DISCUSSION

Father contends the juvenile court erred in finding there was not a beneficial parent-child relationship between him and Y that precluded adoption as Y's permanent plan. (§ 366.36, subd. (c)(1)(B)(i).)

A. *Applicable Law*

After reunification services are terminated, the court's focus shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re*

8

*Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*); accord, *In re D.M.* (2012) 205 Cal.App.4th 283, 290.)

At the section 366.26 hearing, if the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one or more of the enumerated statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi).) The parent has the burden to establish the facts supporting an exception. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553 (*C.F.*).)

Father relied on section 366.26, subdivision (c)(1)(B)(i), which provides an exception to the adoption preference if terminating parental rights would be "*detrimental to the child*" because "[t]he parents have maintained regular visitation and contact with the child and the child would *benefit from continuing the relationship*." (Italics added.) We have interpreted the phrase "benefit from continuing the relationship" to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, 27 Cal.App.4th at pp. 574-575; accord,

9

*C.F., supra*, 193 Cal.App.4th at pp. 555-557; *In re Jason J.* (2009) 175 Cal.App.4th 922, 936-937 (*Jason J.*).)

To meet the proof burden for this statutory exception, the parent must show a relationship that is more than frequent and loving contact, a bond with the child, or pleasant visits. (*C.F., supra*, 193 Cal.App.4th at p. 555; *Jason J., supra*, 175 Cal.App.4th at pp. 936-937; *In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) Although daily contact is not necessary, the "parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent." (*C.F., supra*, at p. 555; *Derek W., supra*, at p. 827; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) "A friendly relationship . . . 'is simply not enough to outweigh the sense of security and belonging an adoptive home would provide.' " (*Jason J., supra*, 175 Cal.App.4th at p. 938.) "Interaction between [a biological] parent and child will always confer some incidental benefit to the child." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) "For the exception to apply, 'a *parental* relationship is necessary. . . .' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)

A court must balance the competing considerations (the benefits of continuing the relationship with the biological parent versus the benefits of stability and permanence in an adoptive home) " 'on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349-1350.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the

10

parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Id.* at p. 1350.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

## B. *Analysis*

At the section 366.26 hearing, the court recognized that Father had regularly visited with Y, and had manifested love and affection towards his daughter during the visits. But the court also found the relationship was not the type of relationship that met the standard for triggering the statutory exception. Overwhelming evidence supported this finding.

The evidence showed Y regarded Father as a "friendly visitor" during her brief twice-monthly visits with Father. As noted by the social worker, Father spent most of the visits sitting next to Y and engaging in parallel play. There was no evidence that this affectionate interaction between Father and Y resulted in the type of attachment that would cause Y to be "greatly harmed if parental rights were terminated." (*Jason J., supra*, 175 Cal.App.4th at p. 938.)

In his brief, Father discusses evidence showing he engaged in various parental-type tasks during the visits, including holding Y, walking around with her, kissing her, checking her diapers, and giving her a bottle. However, the court had a reasonable basis

11

to find these activities did not give rise to the type of relationship with Father that would outweigh the benefits to be gained from an adoption. There was no evidence Father's caretaking activities during his visits resulted in Y having an emotional parent-type connection with him. She separated easily and did not look primarily to Father for comfort or assistance during the visits.

Father's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 is unhelpful. In *S.B.*, this court found the court erred in terminating parental rights where the evidence showed the father had been his child's primary caretaker for three years, and after one year apart the child maintained a strong attachment to her father and would be "greatly harmed" by the termination. (*Id.* at pp. 300-301.) There was no evidence that Y had a similarly strong attachment to Father.

In his reply brief, Father contends that to satisfy the statutory exception a parent need not show he or she was the primary caretaker or that the child has a "primary attachment" to the parent. We agree with these assertions. In unusual cases, the courts have applied the statutory exception despite that the parent did not have daily contact with the child and/or where the child had a strong attachment to the current caregiver. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621; *In re Scott B.* (2010) 188 Cal.App.4th 452, 470-472; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689-691; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

But there is no showing the court misunderstood these concepts. The record of the section 366.26 hearing makes clear the court applied the correct legal principles to the facts before it. The court quoted the *Autumn H.* language, emphasized the need for

12

Father to show "a substantial, positive emotional attachment such that [Y] would be greatly harmed" if rights were terminated, and properly focused on the relationship between Father and Y. In so doing, the court did not err in also evaluating Y's relationship with her maternal aunt. A child's status at the time of the section 366.26 hearing is relevant in determining whether the child's emotional bond with his or her parent outweighs the benefits that an adoption would provide.

Finally, we reject Father's argument that the court abused its discretion in not selecting guardianship with the maternal aunt as the proper plan. Because the court found the beneficial parent-child exception asserted by Father was inapplicable and there were no other compelling reasons that Y would suffer detriment from the termination, the court did not have discretion to select a lesser plan.

DISPOSITION

Affirmed.


HALLER, J.

WE CONCUR:


NARES, Acting P. J.


O'ROURKE, J.


13